**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MAX E. SILVER,**

        **Plaintiff,**

**v.**

        **CIVIL ACTION NO. 1:06CV70**
        **(Judge Keeley)**

**MICHAEL J. ASTRUE,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

Max E. Silver ("Plaintiff") filed his application for DIB on March 3, 2003, alleging disability

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

as of February 2, 1998, due to a right hand injury (R. 79, 89).[2]  His insured status expired December 31, 2002 (R. 18, 45).  Plaintiff last worked full time in 1998.  He receives workers' compensation benefits.  Plaintiff also earned approximately $1,000.00 per year from donations for ministry work during 1998, 1999, 2000, and 2001, working approximately 40 hours per month.  He last performed paid ministry work in 2002, earning $200.00 for that year (R. 81).   Plaintiff's DIB application was denied initially and on reconsideration (R. 38, 43).   Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") William Clark held on December 19, 2003 (R. 391).  Plaintiff, represented by counsel, testified, along with Vocational Expert Jan Howard Reed ("VE").  The ALJ rendered a decision on September 12, 2005, finding that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (R. 28).   The Appeals Council denied Plaintiff's request for review on April 12, 2006, making the ALJ's decision the final decision of the Commissioner (R. 7).

## II. Statement of Facts

Plaintiff was born on January 22, 1952, and was 50 years old on his date last insured (R. 73). He has a an 8th grade education and earned his GED (R. 395).  He has past work as a union lineman until December 1997 (R. 396).  He worked since then as an "assistant pastor," receiving about $25.00 per week for about 10 to 15 hours a week (R. 397).  His duties at this job consisted mostly of teaching Sunday School and counseling.  He last performed this work in 2001, testifying he left the job primarily because he and the pastor did not get along.  He still performed marriages and

_____

[2]Plaintiff filed an application for DIB in 1999, which was denied.  He did not appeal this decision.

burials without pay.

On June 11, 1999, Plaintiff was found not disabled at the Initial level on his 1999 application (R. 30). The decision was based on his primary diagnosis of status post metacarpal fracture and secondary diagnosis of lunotriquetal tear. The decision stated in pertinent part:

> Your medical records show that you have been under treatment for your right wrist which was injured in 1996. Despite treatment, however, you continue to experience discomfort and weakness. Recently it has been recommended that your [sic] use a splint to immobilize your wrist intermittently, and you have had cortisone injections.

> We agree with your doctor that you are unable to return to your past job as a lineman, but based on your age of 47 years, your education (GED) and past work experience, your condition does not prevent you from doing less strenuous work which would not require lifting with your right hand.

(R. 33). As already noted, Plaintiff did not appeal this decision.

On March 30, 2003, Plaintiff completed a "Disability Report" regarding the current application (R. 102). In this application, he alleged the condition that limited his ability to work was: "Loss of strength in right hand and pain, left shoulder pain and loss of motion in hand and shoulder" (R. 103).

On May 22, 2003, Plaintiff was found not disabled at the Initial level (R. 31). The primary diagnosis upon which the decision was based was status post right wrist injury with ligament tear and the secondary diagnosis was spinal disc disorder. The decision stated, in pertinent part:

> Your medical records show that you have had a long history of problems with your wrist. While you had undergone multiple procedures, you reported continued discomfort and weakness. You also reported back and neck pain, and had undergone arthroscopic surgery for a nerve impingement in your shoulder. You were, however, able to stand and walk in a normal manner and could use your arms and hands for basic grasping and handling.

On June 23, 2003, Plaintiff was found not disabled at the reconsideration level (R. 32). The

3

primary diagnosis upon which the decision was based was status post right wrist injury and his secondary diagnosis was spinal disc disorders (discogenic/degenerative).

In Plaintiff's Request for hearing by Administrative law Judge dated July 18, 2003, he stated:

> I suffered from physical injuries that prevented me from working when I was last insured for disability benefits on 12/31/02. I have had 3 surgeries on my [right] hand and 1 surgery on my [left] hand. I have had lower back surgery and [left] leg surgery.

(R. 45).

A September 29, 1997, MRI of the right wrist indicated Plaintiff had a possible triangular fibrocartilage complex ("TFCC") and lunotriquetal tear (R. 162).

Plaintiff underwent arthroscopic surgery of the right wrist on February 2, 1998 (R. 169). It indicated Plaintiff had a near complete lunotriquetal tear, and intact TFCC (R. 169). He underwent debriding and shaving of the joint and the lunotriquetal tear.

On February 13, 1998, Plaintiff's treating hand specialist, Peter Innis M.D., noted that Plaintiff's wrist arthroscopy documented a lunotriquetal tear but an intact TFCC (R. 155). Plaintiff also underwent surgical debridement and shaving. Dr. Innis opined that Plaintiff's options were to do nothing "and tolerate this" versus lunotriquetal pinning or fusion. He told Plaintiff that the fusion would be most reliable for pain relief, but that he would "lose some wrist motion with that." Dr. Innis also noted that Plaintiff might require a new job that would not involve any heavy lifting or gripping with his right wrist.

Plaintiff underwent therapy two times a week after his surgery (R. 204).

On May 4, 1998, Plaintiff underwent a functional capacity evaluation ("FCE") (R. 204). The results were considered valid, and showed that Plaintiff's right hand and wrist strength were significantly decreased, with range of motion less limited. He was able to use his hand for eating,

4

dressing, and lifting light objects. He could carry 15 pounds in his right hand with his wrist in the neutral position, but would only be able to lift-carry very light (under 5 pounds) objects if his wrist was positioned other than neutral. He could perform tasks which did not involve lifting or holding objects over a few pounds in the right hand. The examiner opined that Plaintiff lacked sufficient right hand and wrist strength to perform his previous job or coordination for tasks such as light assembly, but he did demonstrate strong verbal skills and a strong work history.

On May 7, 1998, Dr. Innis wrote that Plaintiff's grip strength had not increased at all following wrist arthroscopy, and remained at about 20-25% (R. 149). He recommended vocational rehabilitation.

On June 16, 1998, Dr. Innis reviewed the FCE, noting that Plaintiff tested out in a light/medium functional capacity (R. 148). The doctor opined that Plaintiff could not lift over 20 pounds, and could lift only up to 10 pounds frequently due to his right hand injury.

On August 6, 1998, Dr. Innis noted that Plaintiff continued to have right wrist pain and had not yet returned back to work, although he did have multiple applications on file (R. 147). Dr. Innis recommended Relafen and a wrist splint.

On January 31, 1999, Dr. Innis recommended Plaintiff get a second splint to immobilize his wrist intermittently and gave him a cortisone injection (R. 146).

On May 19, 1999, Dr. Innis noted that he had followed Plaintiff since his 1996 right wrist injury (R. 145). Plaintiff had been unable to return to his old job, and Dr. Innis opined that he would be unable to do that job in the future due to his wrist condition and pain. He opined that Plaintiff was permanently disabled from his prior employment as a lineman.

On June 18, 1999, Dr. Innis recommended Plaintiff's splint be adjusted and that he be

allowed a second short arm splint for his wrist (R. 144).

On March 27, 2000, Plaintiff presented to his doctor saying he needed a prescription for an overseas trip (R. 383). He said he generally felt good and wanted to get back to work.

On April 6, 2000, Dr. Innis wrote that Plaintiff continued to have right wrist pain which increased approximately one month earlier (R. 142). Plaintiff reported he might have a new job as a co-pastor at a church, which would not require any significant lifting and gripping. Plaintiff had had to stop taking Relafen because it bothered his stomach, and the doctor suggested trying Celebrex.

On September 26, 2000, Dr. Innis again noted that Plaintiff had a lunotriquetal tear (R. 142). He discussed treatment options, and Plaintiff chose to proceed with wrist fusion surgery.

On October 26, 2000, Plaintiff presented to his doctor with complaints of severe back pain (R. 380). He said he awoke the day before with constant sharp stabbing pain. He was diagnosed with low back strain. There were no acute changes on x-ray.

On November 6, 2000, Plaintiff underwent a right wrist lunotriquetal fusion with radius bone graft and two 2.0 screws (R. 224).

On November 10, 2000, Plaintiff told his doctor his back pain was getting worse (R. 379).

On November 17, 2000, Plaintiff was doing well post wrist fusion and x-rays showed good position (R. 141).

On December 14, 2000, Dr. Innis noted that Plaintiff was doing well five weeks post fusion, but was still somewhat tender (R. 140).

On January 8, 2001, Dr. Innis found that Plaintiff was doing generally well two months after his fusion (R. 139). He still had some pain and swelling but x-rays showed the fusion site was healing and he had made some gains in therapy. Plaintiff was to remain out of work pending follow-

up in a month.

On February 6, 2001, Dr. Innis noted that Plaintiff's x-rays showed a healed fusion site, but that Plaintiff still had significant limitation of wrist motion and was still quite weak (R. 138). He recommended Plaintiff could return to work if light duty was available, and opined that Plaintiff would require a permanent restriction of 30 pounds lifting.

On March 7, 2001, Plaintiff told his doctor he was going overseas and needed a prescription for malaria (R. 378).

On March 13, 2001, Dr. Innis noted that x-rays showed solid lunotriquetal fusion, but with neutral ulnar variance (R. 137). He opined that Plaintiff might have some pain from ulnocarpal abutment. He wanted Plaintiff to try to live with this for a while before considering further surgery. Dr. Innis recommended job modification with a 15 to 20 pound lifting limit rather than his prior recommendation of 30 pounds based on the lack of progress and continued difficulties.

On August 13, 2001, Plaintiff presented to his doctor with complaints of left shoulder pain radiating down his arm with no known injury (R. 378). He was scheduled for an MRI of the cervical spine.

On October 29, 2001, Plaintiff presented to his doctor with left shoulder pain radiating into the elbow (R. 377).

A November 2, 2001, cervical MRI was "[e]ssentially normal" (R. 226).

On November 7, 2001, Plaintiff reported a slight improvement in his shoulder, and said that Ultram helped (R. 376). He was told his MRI was negative. Upon exam the cervical area was tender.

A January 4, 2002, MRI of the left shoulder was "consistent with tendinosis involving the

supraspinatus tendon," but was otherwise normal (R. 225).

On January 17, 2002, Plaintiff presented to Dr. John Draper, M.D. for complaints of pain in his left shoulder (R. 240). Plaintiff told Dr. Draper he was a minister but was on worker's compensation right now. He awoke last September with pain in his left shoulder and neck. He reported that a steroid injection had helped for about a week. Upon examination, Plaintiff had full range of motion of the cervical spine and there was nothing to suggest a cervical radiculopathy. He was tender to palpation over the tip of the acromion and had pain with abduction and forward flexion. Cervical MRI was normal and shoulder MRI showed tendinosis of the supraspinatus tendon. The diagnosis was impingement of the left shoulder.

On March 1, 2002, Dr. Innis wrote to Plaintiff's workers' compensation insurer (R. 135). He noted he had been following Plaintiff for his right wrist injury for over two years. Dr. Innis noted that Plaintiff had a LT fusion with two screws on November 5, 2000, and that he continued "working as an assistant pastor at a church but []changed churches recently." Dr. Innis opined that Plaintiff had some difficulty, especially with using his wrist at home, including tools or lifting and gripping, and yard work. He opined that Plaintiff had a lifting limit of 30 pounds, "but will have some discomfort lifting anything more than 10 to 15 pounds." Plaintiff was taking Ultram intermittently for the wrist pain and also was taking Hydrocodone for his left shoulder.

Dr. Innis opined that Plaintiff had sustained a right wrist injury with ligament tear, resultant fusion, loss of motion, and loss of strength. He also opined that Plaintiff had reached maximum medical improvement and had a total impairment of 17% due to loss of motion, loss of grip strength, loss of use, and pain – all in his right wrist.

On May 20, 2002, Dr. Moore reported that Plaintiff presented with a six month history of

8

severe pain of the left shoulder and pain on abduction and rotation (R. 134). He had had injections of the shoulder without benefit. An MRI was consistent with tendinitis. A cervical MRI was normal. Clinically, Plaintiff had a markedly positive impingement sign with pain on abduction and rotation. Dr. Moore was to schedule outpatient shoulder arthroscopy in the future.

On July 8, 2002, Plaintiff underwent a left shoulder arthroscopy and subacromial decompression (R. 241). Diagnosis, both pre and post-op was impingement syndrome.

On July 16, 2002, Dr. Moore opined that Plaintiff was unable to work until after his next appointment on August 20, 2002 (R. 133).

On August 27, 2002, Dr. Moore noted that Plaintiff still had pain after his acromial decompression (R. 132). He did, however, have good range of motion.

On October 30, 2002, Dr. Moore noted that Plaintiff reported mid-back pain, left-sided neck pain, and shoulder pain on extremes of range of motion (R. 131). X-rays showed Plaintiff had osteoarthritis of the AC joint. The doctor prescribed Percocet and therapy.

Plaintiff underwent physical therapy for his left shoulder from approximately September 2002, until November 2002 (R. 281-311).

On November 12, 2002, Dr. Moore noted that Plaintiff still had neck and back pain (R. 130). He was going to refer Plaintiff to a back specialist.

A December 9, 2002, MRI of the cervical and thoracic spines showed mild degenerative disc disease at C3-4 and C5-6 with no significant canal or neural foraminal compromise, and small protrusions at T9-10 through T11-12 causing minimal stenosis (R. 312).

December 31, 2002, is Plaintiff's date last insured.

On March 25, 2003, Plaintiff presented to an orthopedist upon referral from his regular

9

doctor for his continued left shoulder and arm pain (R. 243). Plaintiff told the doctor he had had shoulder pain for six months before his surgery, but his pain never improved and he had lost motion in his shoulder since the surgery. Injections of the shoulder did not help.

Upon examination Plaintiff was diffusely tender to palpation along the shoulder and had limited range of motion in all planes. Reflexes were intact, although he had slightly weak wrist flexors on the left. The doctor reviewed the pre-surgery shoulder MRI and did not see any abnormalities, and stated he was "not sure why he had the decompression to be honest." The doctor reviewed the cervical MRI which had been deemed essentially normal, but opined that Plaintiff may have a disc bulge or even herniation at C6-7. He diagnosed left shoulder pain status post arthroscopy; some degree of adhesive capsulitis of the left shoulder; and left upper extremity pain, rule out radiculopathy. He believed perhaps that Plaintiff "could have more than one problem going on," and that he was not sure if the shoulder was causing it all. He recommended an EMG of the left arm. An April 4, 2003, EMG of Plaintiff's left arm was within normal limits and without evidence for active radiculopathy of left C5 through T1 (R. 246). The examiner noted that Plaintiff displayed "very histrionic behavior throughout the study with emotional responses to minor discomfort far out of proportion to those expected." He strongly advised conservative measures be used in the management of Plaintiff wherever possible.

An April 21, 2003, MRI of the left shoulder indicated mild supraspinatus stenosis; no rotator cuff tear; mild bone marrow edema signal, likely due to slight AC joint arthrosis; and possible labral injury that was not well delineated by MRI and could not be ruled out (R. 258).

On April 30, 2003, Dr. Innis examined Plaintiff for the State Disability Determination Section ("DDS") (R. 259). The doctor found that Plaintiff had abnormal fine motor ability in the

10

right arm, abnormal gross motor ability in the right arm, abnormal joints in the right arm, abnormal range of motion of the right arm, abnormal muscle bulk of the right arm, and abnormal motor strength and coordination of the right arm. Dr. Innis diagnosed right wrist torn LT ligament– status post LT fusion right wrist.

On May 9, 2003, Plaintiff saw Joseph C. Canvin, M.D., upon referral of his doctor (R. 262). His chief complaint was left shoulder and periscapular pain that started in February 2002. Dr. Canvin's diagnosis was supraspinatus tendinopathy with a tight posterior shoulder joint and subsequent myofascial spasm in the periscapular muscles on the left side. He opined the underlying problem was the supraspinatus tendinopathy. He opined there might also be a C-7 radiculopathy on the left, but, given that his EMG was normal, this must be an old injury.

On May 21, 2003, State agency reviewing physician Cynthia Osborne completed a Residual Functional Capacity Assessment ("RFC") based on right wrist fusion and left shoulder pain (R. 265). She found Plaintiff could lift 20 pounds occasionally and 10 pounds frequently. He could stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. He could only occasionally perform all posturals. He had no manipulative, visual, or communicative limitations. He should avoid concentrated exposure to extreme cold and hazards. Dr. Osborne's RFC was affirmed by State agency reviewing physician Thomas Lauderman on June 23, 2003 (R. 272).

Treating physician Donald Jansen, M.D. completed an examination for the State DDS on June 23, 2003 (R. 273). He noted Plaintiff's history of left shoulder problems with surgery, and right hand disability from work-related injury. Dr. Jansen found Plaintiff had abnormal fine motor skills of the right hand; abnormal gross motor ability of the left shoulder; abnormal joints in the left arm, right arm, and left leg due to back pain; and abnormal range of motion of the left arm, right arm, and

11

left leg due to slight back pain. His diagnosis was shoulder impingement, unresponsive to surgical intervention and traumatic arthritis of the right wrist.

Dr. Jansen opined that Plaintiff was unable to lift; could stand for short periods; could walk short distances; and could sit for intermediate periods in comfortable chair.

Plaintiff underwent physical therapy for his shoulder from about May through July 2003 (R. 314-330).

Plaintiff underwent a hand surgery consultation on September 11, 2003 (R. 331). He was complaining of some pain at the extensor site of his wrist near the bone graft site from his old fusion surgery which was performed in October 2000. He noted it had been bothering him for the last several weeks. On physical exam, he had some mild swelling and discomfort with palpation along the radial wrist extensors near the bone graft scar, with no radiocarpal pain or instability. He had some swelling at the right ring finger compatible with stenosing tenosynovitis. The doctor recommended a wrist splint and Motrin.

A September 19, 2003, MRI of the lumbar spine showed a mild broad disc bulge at L2-3 and L3-4 which was not causing any significant neural foraminal or spinal canal stenosis; partial sacralization of L5; mild degenerative facet changes at L3-4 bilaterally; and mild degenerative disc disease with Schmorl's nodules at multiple levels (R. 276).

At the administrative hearing on December 19, 2003, the ALJ noted that Plaintiff's Date Last Insured was December 31, 2002 (R. 393). Plaintiff testified he last worked regularly in 1997, but did a little work as an assistant pastor since then. He worked about 10 to 15 hours per week, mostly teaching Sunday school and counseling. He had received about $25.00 a week, but not consistently. That work ended in November 2001, primarily because he and the pastor did not get along.

12

The VE testified that Plaintiff had "essentially no[]" skills transferable to a light exertional level (R. 424). The ALJ then asked the VE if any work would exist at the light exertional level for a person of Plaintiff's age, education, and work experience, with no climbing ladders, ropes or scaffolds; no exposure to temperature extremes; no exposure to severe vibration with the arms; no exposure to hazardous machinery; and no reaching above shoulder level with the left arm (R. 424). The VE testified in response that the jobs of unarmed security guard, packer, and host would be available.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits only through December 31, 2002.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's degenerative disc disease and status post shoulder surgery are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform the demands of light work activity through the date last insured, with no climbing of ladders, ropes and scaffolds; no reaching above shoulder level with the non-dominant extremity; and with no exposures to extensive cold, vibration of arms, and

hazardous machinery.

7.  The claimant was unable to perform any of his past relevant work prior to the date last insured (20 CFR § 404.1565).

8.  The claimant is an "individual closely approaching advanced age" (20 CFR 404.1563).

9.  The claimant has a "high school (or high school equivalent) education" (20 CFR 1564).

10. The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR 404.1568).

11. The claimant had the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include work as an unarmed security guard (800 locally and 200,000 nationally), packer (500 locally and 150,000 nationally), and as a host (1,000 locally and 200,000 nationally).

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g)).

(R. 27).

## IV.  DISCUSSION
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court

disagrees, so long as it is supported by substantial evidence." <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends that the Administrative Law Judge's conclusion that he was not disabled at any time prior to the date his insured status for Social Security Disability benefits lapsed is not supported by substantial evidence because:

1. The ALJ failed to consider any limitations resulting from the fusion of Plaintiff's right wrist;

2. The ALJ applied the wrong legal standard in determining that Plaintiff's testimony of pain and limitations was not credible;

3. To the extent that the ALJ's decision is based on a finding that Plaintiff has transferable skills, there is no support for that conclusion in the record; and

4. None of the jobs upon which the ALJ relied to conclude that Plaintiff was not disabled prior to December 31, 2002, can be performed by an individual with his limitations and vocational background.

Defendant contends substantial evidence supports the Commissioner's decision that Plaintiff was not disabled on or before December 31, 2002, his date last insured, because:

1.  Plaintiff's hand injury is not disabling;

2.  The ALJ properly considered Plaintiff's testimony regarding his impairments;

3.  Overall, the errors that Plaintiff point [sic] to in the evaluation of this claim are harmless; and

4.  Plaintiff incorrectly contends that the vocational expert testimony is flawed because the skill level and requirements identified by the DOT were different from the testimony of the vocational expert.

## C. Right Wrist Injury

Plaintiff first argues that the ALJ failed to consider any limitations resulting from the fusion of Plaintiff's right wrist. Defendant contends that Plaintiff's hand injury is not disabling. Defendant further contends that on or before his date last insured, Plaintiff could perform light to medium work, as evidenced by a functional capacity evaluation, and confirmed by the treatment notes of his long-standing treating physician, Dr. Innis.

The undersigned finds Plaintiff's argument in this regard persuasive and dispositive. Both Plaintiff's applications for DIB were based, at least in part, on his right wrist injury. The first denial listed diagnoses of status post metacarpal fracture and lunotriquetal tear. The denial noted Plaintiff had been under treatment for his right wrist, but continued to experience discomfort and weakness. In his second (current) application, Plaintiff stated the condition that limited his ability to work was "Loss of strength in right hand and pain, left shoulder pain and loss of motion in hand and shoulder." The Initial denial was based on status post right wrist injury with ligament tear. The denial itself expressly noted Plaintiff's long history of right wrist problems. The Reconsideration denial was

based on a primary diagnosis of status post right wrist injury. In Plaintiff's Request for Hearing, he stated, among other conditions, that he had had three surgeries on his right hand.

The record irrefutably shows that Plaintiff had a right hand and wrist injury which resulted in arthroscopic surgery in 1998 and fusion surgery in 2000. When recommending the fusion, Dr. Innis, Plaintiff's treating hand specialist, warned him it would result in loss of some wrist motion. The 1998 (pre fusion) FCE showed that Plaintiff's right hand and wrist strength were significantly decreased, and range of motion was also decreased. He could carry 15 pounds in that hand in the neutral position but only under five pounds in any other position. He lacked not only the strength to perform his previous job, but also coordination for tasks such as light assembly.

Plaintiff underwent the fusion surgery in November 2000. Three months later, he still had significant limitation and weakness of the right wrist. Dr. Innis further reduced Plaintiff's lifting to 15-20 pounds. More than a year after his surgery, and nine months before Plaintiff's date last insured, Dr. Innis opined that Plaintiff had some difficulty with tools, lifting and gripping, and yard work. Although Dr. Innis limited him to 30 pounds lifting, he also opined that Plaintiff would "have some discomfort lifting anything more than 10 to 15 pounds." Dr. Innis also opined that Plaintiff had reached maximum medical improvement, and that his total impairment was 17% for loss of motion, loss of grip strength, loss of use, and pain of the right wrist alone.

On April 30, 2003, four months after Plaintiff's date last insured, Dr. Innis opined that Plaintiff still had abnormal fine motor ability, gross motor ability, range of motion, motor strength, and coordination of the right arm, due to right wrist torn LT ligament– status post LT fusion right wrist.

Despite all of the above, ALJ Clark determined that Plaintiff's only severe impairments were

degenerative disc disease and status post left shoulder surgery (R. 20). There is absolutely no discussion of Plaintiff's right hand impairment. The sole mention of a right hand/wrist problem in the decision is in a recital of Plaintiff's testimony. There is no mention of Dr. Innis' opinion regarding Plaintiff's use of his hand, or that he had a 17% impairment solely based on his hand injury.

As Defendant argues, Plaintiff's right hand impairment may not be disabling. The evidence indicates it was a severe impairment as of Plaintiff's date last insured, however. The Fourth Circuit has stated:

> " [A]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)(*quoting Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations* (1980) (emphasis added).

Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). Under this definition, Plaintiff's right wrist injury with resulting fusion was a severe impairment as of his date last insured. Yet the ALJ included no right hand gripping or manipulative limitations in his RFC, concluding that Plaintiff "retained the residual functional capacity to perform the demands of light work activity through his date last insured, with no climbing of ladders, ropes and scaffolds, no reaching above shoulder level with the non-dominant [left] extremity, and with no exposure to extensive cold, vibration of arms, and hazardous machinery" (R. 24).

The ALJ's hypothetical to the VE also includes no limitation regarding Plaintiff's right (dominant) hand. When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a

consideration of all relevant evidence of record on the claimant's impairment." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir.1993) (citing Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. Edwards v. Bowen, 672 F. Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." English v. Shalala, 10 F.3d 1080, 1085 (4th Cir. 1993).

The undersigned therefore finds substantial evidence does not support the ALJ's RFC, his hypothetical to the VE, or his conclusion that Plaintiff was not disabled at any time prior to his date last insured.

Even if Plaintiff's right hand impairment were found to be non-severe, it is undisputably a medically determinable impairment. As such, the ALJ was required to consider it throughout the decision. The Regulations require that if a 'severe' impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis. 20 C.F.R. §404.1523 provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment , if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

The ALJ did not consider Plaintiff's right hand impairment throughout his determination, either singly or in combination with his other severe impairments.

The undersigned therefore finds substantial evidence does not support the ALJ's determination that Plaintiff was not disabled on or before his date last insured.

## D. Credibility

Plaintiff next argues that the ALJ applied the wrong legal standard in determining that Plaintiff's testimony of pain and limitations was not credible. Defendant contends that the ALJ properly considered Plaintiff's testimony regarding his impairments. The undersigned has already found that the ALJ did not consider Plaintiff's medically determinable dominant hand impairment. Plaintiff's long-time treating physician, a hand specialist, opined in March, 2002, only nine months before Plaintiff's date last insured, that Plaintiff would have some discomfort lifting anything more than 10 to 15 pounds. He found Plaintiff had a 17% total impairment based on loss of motion, loss of strength, loss of use, and pain in the right hand. Four months after Plaintiff's date last insured, the treating specialist opined that Plaintiff continued to have abnormal fine motor ability, gross motor ability, range of motion, motor strength and coordination in that arm.

The undersigned finds the ALJ's failure to consider Plaintiff's hand impairment is fatal to his credibility determination, and therefore finds substantial evidence does not support the ALJ's determination that Plaintiff's allegations regarding his limitations were not totally credible.

## E. Transferability of Skills

Plaintiff next argues that to the extent that the ALJ's decision is based on a finding that Plaintiff has transferable skills, there is no support for that conclusion in the record. Defendant contends that overall, the errors that Plaintiff points to in the evaluation of this claim are harmless. In his "Findings," the ALJ states that Plaintiff had "transferable skills from skilled work previously performed as described in the body of the decision" (R. 27). In "the body of the decision," however,

the ALJ states: "there is no evidence that he has acquired any transferable work skills" (R. 25). The VE testified that Plaintiff's skills from his past work were "essentially not" transferable to a light exertional level job (R. 424).

The ALJ also found that Plaintiff was "an individual closely approaching advanced age," but then stated that he used "Medical-Vocational Rule 202.21 as a framework for decision-making" (R. 27). 202.21 pertains to "younger individuals," however. See Pt. 404, Subpt. P, App.2, Table No. 2. The undersigned believes both appear to be simple typographical or "cut and paste"errors that did not affect the decision substantively. Because the undersigned finds the claim should be remanded to the Commissioner for other reasons, however, there is no need for speculation. The Commissioner shall correct both errors upon remand.

### F. Vocational Testimony and DOT

Plaintiff lastly argues that none of the jobs upon which the ALJ relied to conclude that he was not disabled prior to December 31, 2002, can be performed by an individual with his limitations and vocational background. Defendant contends that Plaintiff's argument that the VE testimony is flawed because the skill level and requirements identified by the DOT were different from the testimony of the vocational expert is incorrect. The undersigned has already found that the ALJ's hypothetical to the VE did not include all of Plaintiff's limitations that were supported by the record. Substantial evidence therefore does not support the ALJ's reliance on the ALJ's testimony, or his resulting conclusion that there are a significant number of jobs in the national economy that Plaintiff could perform. See Walker v. Bowen, 876 F.2d 1097, 1100 (4th Cir.1989).

### V. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary

Judgment [Docket Entry 22] be **DENIED**, and Plaintiff's Motion for Summary Judgment [Docket Entry 18] be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _21_ day of _May_ 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE